IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                      Criminal No. 3:98cr150-01

JOSEPH BULLOCK, III


## MEMORANDUM OPINION

This matter is before the Court on the defendant's *pro se* MOTION PURSUANT TO TITLE 18 U.S.C. SECTION 3582(c)(1)(A) FOR SENTENCE REDUCTION UNDER THE FIRST STEP ACT OF 2018 (ECF No. 341) ("*Pro Se Motion*"); the SUPPLEMENTAL MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) (ECF No. 362) ("Counsel Motion"); and the United States' Response in Opposition to Defendant's Motion for Compassionate Release (ECF No. 364).


## BACKGROUND

In February 1999, Joseph Bullock, III pled guilty to three counts of a thirteen count Indictment, in particular, Counts Four, Seven and Eight, each of which alleged a charge of murder while engaged in a drug conspiracy in violation of 21 U.S.C. § 848(e). At the time of the plea, Bullock was facing the risk of the death penalty and, in exchange for Bullock's guilty pleas, the United

States moved to withdraw its Notice of Intent to seek a sentence of death (Presentence Report, ECF No. 353, p. 4, ¶ 4).

According to the Presentence Report (and not in dispute), Bullock participated in a drug conspiracy from 1987 to at least 1997. Bullock and others distributed more than five kilograms of powder cocaine, more than 50 grams of crack cocaine, and more than one kilogram of heroin. (ECF No. 353, ¶17).

During and in furtherance of the drug trafficking conspiracy, Bullock shot and killed Larry Spruill, Charlie Blount and Steven Mitchell. Before killing Spruill, Bullock held him captive and stole from him nine ounces of crack cocaine as well as some cash. The murder of Charlie Blount and Steven Mitchell, which occurred approximately a year after the murder of Larry Spruill, was conceived by Bullock because Blount had failed to pay Bullock for drugs and Bullock wanted to rob Mitchell of drugs and money. Bullock enlisted two co-conspirators to assist in the murders of Blount and Mitchell.

In the *Pro Se* Motion, Bullock "submits this request [for compassionate release] as a result of the 'coronavirus' (COVID-19), that has resulted in a global pandemic." (ECF No. 341, p. 1).[1] The Counsel Motion argues that "[t]his motion should be

---

[1] It is undisputed that Bullock has satisfied the exhaustion requirement.

granted because the global COVID-19 pandemic combined with Mr. Bullock's medical conditions and exemplary prison record presents an 'extraordinary and compelling reason' for compassionate release." (ECF No. 362, p. 1). According to the Counsel Motion, Bullock has a history of high blood pressure, a chronic medical condition. Additionally, Bullock is obese.[2] The Counsel Motion also advises that Bullock has experienced a bloody stool "but has refused either a colonoscopy or a consultation with a gastrointestinal specialist due to feeling hopeless because he is serving a life sentence." (ECF No. 362, p. 6). Additionally, Bullock has edema in his legs and alleged undefined kidney problems.

After making those recitations, the Counsel Motion asserts that "[t]he most meritorious ground for Mr. Bullock's motion being granted would be the <u>existence of the coronavirus outbreak</u> and the <u>enhanced risk to him based on his age</u>, the <u>number of health conditions</u> he suffers from, as well as his <u>limited disciplinary record</u> while incarcerated." (ECF No. 362, p. 7 (emphasis added)). The Counsel Motion also contends that the factors under 18 U.S.C. § 3553(a) and his rehabilitative efforts weigh in favor of relief.

---

[2] The Counsel Motion also asserts that Bullock is pre-diabetic but that does not appear to be a basis for compassionate release because the A1C (a measurement for diabetes) is regularly monitored.

3

Bullock acknowledges the murders that he committed; and he admits that he "was facing the death penalty for the murders of three other peopled engaged in the drug trade." (ECF No. 362, p. 14). The Presentence Report (ECF No. 353) outlines the circumstances of the vicious murders committed by Bullock and explains his criminal history category of VI.

Bullock tells that he had a chaotic childhood in which his basic emotional needs were never met within the family. Both his mother and father suffered from personality disorders (inadequate type). It is said that Bullock suffered from regular physical abuse from his grandparents.

The Presentence Report describes certain conduct that was not considered part of relevant conduct. In particular, in ¶¶ 44-52, the report explains that Bullock shot Timothy Bell in the head in 1985; shot Thomas Horton in the shoulder in 1989; abused his wife; and, in 1988 and 1991, he shot her as well. The report also says that Bullock repeatedly abused a girlfriend by beating her so badly that he damaged her kidney; and then he abused another girlfriend by stabbing her and subsequently holding her hostage to keep her from testifying in a state prosecution about the attack. Finally, the report chronicles that Bullock repeatedly abused another girlfriend, threatened to kill his mother and brother, accepted a

contract to kill one Tion Kimbrough, and abused his six-year old son by beating him severely.

Bullock is confined at FCI Butner which houses a total of approximately 1,500 inmates. At the time the Government filed its papers in this matter, four inmates and two staff members reported testing positive for COVID-10 and 343 inmates and 83 staff members previously tested positive but had recovered. Additionally, 3,764 inmates had received both doses of COVID-19.[3]

The *Pro Se* Motion (ECF No. 341) details that, during his 23 years in prison, Bullock: (1) obtained his G.E.D. certificate and a barber's certification; (2) maintained employment with UNICOR and the Prison Industry Enhancement Certification Program; (3) has satisfied the financial terms of his sentence; and (4) has maintained an exemplary conduct record, for which the Warden has commended him. Bullock also has participated in many educational and self-improvement programs. (ECF No. 341, Ex. A).

The statutory term of imprisonment for each offense of conviction was 20 years (minimum) to life. The applicable guideline calculations produced an offense level of 43 and a life term of imprisonment. On May 10, 1999, Bullock was sentenced to three concurrent terms of life imprisonment.

---

[3] FCI Butner is part of Federal Correctional Complex Butner and the vaccination statistics are for the entire complex.

## DISCUSSION

The applicable statute, 18 U.S.C. § 3582(c)(1)(A), provides, in pertinent part, that, upon appropriate motion, the Court "may reduce the term of imprisonment . . . if it finds that 'extraordinary and compelling reasons' warrant such a reduction." It is settled that the burden is on the defendant to prove that extraordinary and compelling reasons exist for compassionate release under § 3582(c)(1)(A)(i). United States v. White, 378 F. Supp.3d 784, 785 (W.D. Mo. 2019).

The "mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering the Bureau of Prison's statutory role, and extensive professional efforts to curtail the virus' spread. United States v. Raia, 954 F.3d 594, 597 (3rd Cir. 2020). In assessing whether the record shows the existence of extraordinary and compelling reasons for compassionate release, courts consider, inter alia, the guidance of the CDC, and non-binding policy statements of the United States Sentencing Guidelines. See United States v. Beck, 425 F. Supp. 3d 573, 581-82 (M.D.N.C. 2019). The policy statements are not binding but are informative and may be considered. United

6

compassionate release, medical conditions must be serious.  Also, it is generally true that "chronic conditions that can be managed in prison are not a sufficient basis for compassionate release." United States v. Ayon-Nunez, No. 1:16-cr-130, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12, 2020).

To establish existence of "extraordinary and compelling" reasons for compassionate release because of COVID-19, the defendant must show "both a particularized susceptibility to the disease and a particularized risk of contracting the disease at [his] prison facility." United States v. Feiling, 453 F. Supp.3d 832, 840 (E.D. Va. 2020); United States v. White, _____ F. Supp.3d _____, 2020 WL 1906845, at *1 (E.D. Va. April 23, 2020).

## 1.   Particularized Susceptibility

Bullock has established that he has high blood pressure, edema, and obesity.[4]  High blood pressure and obesity have been determined by the CDC to present a higher risk of complication in COVID-19 if contracted.  Edema is swelling caused by excess fluid in body tissue, usually in the legs and ankles.  It can be the product of blood pressure medication.  Edema is a serious condition

---

[4] Bullock reports ongoing medical inquiry into undefined kidney problems and blood in his stool.  Bullock does not contend that those conditions are recognized by the CDC as presenting serious risk factors for contracting COVID-19 or of serious consequences if COVID-19 is contracted.

but it is treated with medication, usually a diuretic. However, the fact that a defendant has established a higher susceptibility to COVID-19 does not resolve the particularized susceptibility requirement because identified risk factor conditions must be serious to constitute extraordinary and compelling reasons. It appears from the record that the conditions on which Bullock bases his motion, although serious, are "chronic conditions that can be managed in prison [and thus] are not a sufficient basis for compassionate release." United States v. Ayon-Nunez, No. 1:16-cr-130, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12, 2020). Bullock has not established that his medical needs cannot be met while incarcerated.

Moreover, Bullock, like almost all inmates at FCI Butner, has been fully vaccinated against COVID-19. He received the Pfizer-BioNTech vaccine which has proven effective in reducing the risk of contracting COVID-19 and the risk of serious consequences if it should be contracted. That fact, the high level of those vaccinated at FCI Butner, and the de minimus number of cases reported at FCI Butner, viewed in perspective of the record about Bullock's claimed health conditions, strongly operate to preclude a finding that the particularized susceptibility test is met here.

In sum, Bullock has not met the particularized susceptibility risk facet of the applicable test.

## 2.    Particularized Facility Risk

Nor has Bullock met the particularized facility risk component of the appropriate test.  His motion cites press releases and information respecting the instances of COVID-19 among inmates and staff at BOP facilities nationwide, but provides no real evidentiary support of a particularized risk of contracting the disease at FCI Butner, the defendant's facility of incarceration. Further, the record reflects that, at the time of the filing of the Government's papers, FCI Butner had four active case of COVID-19 among inmates, two active cases of COVID-19 among staff, and 343 inmates and 83 staff members who had previously recovered from COVID-19.  As of May 11, 2023, the COVID-19 pandemic has been declared ended by the Government.[5]

On this record, Bullock has not met the particularized facility component of the applicable test.

## 3.    Assessment Under 18 U.S.C. § 3553(a)

But, even if Bullock had met the particularized risk assessment and the particularized facility assessment (which he has not), it

---

[5] That, of course, does not mean that one cannot contract COVID-19.  However, it is a factor to keep in mind in determining the record as to both the particularized susceptibility and the particularized facility factors.

would be appropriate to deny compassionate release in perspective of the sentencing factors prescribed by 18 U.S.C. § 3553(a). Compassionate release, of course, is appropriate only where the defendant is not a danger to the safety of any other person or of the community. Bullock argues, in conclusory fashion, that he is not a danger to the community. That, he says, is largely because of his age, the absence of disciplinary events for a decade, and the many rehabilitative programs in which he has participated.

Pursuant to § 3553(a)(1) the Court is to consider the nature and consequences of the offense and the history and characteristics of the defendant. The offenses of conviction here are among the most serious of all crimes. They were deliberate murders of three individuals, as part of a drug trafficking operation. Those offenses of conviction warranted a federal death penalty and the Government had given notice of its intent to seek the death penalty in this case. However, as part of a Plea Agreement, that consequence was taken off the table in return for Bullock's plea of guilty.

There is no doubt that Bullock grew up in a mean and chaotic environment, one that likely contributed in some measure to his violent personality and violent conduct. His record, however, includes not only three murders during the drug conspiracy, but

10

also the wounding and injuring many other people, including his six year old son and several girlfriends.

Thus, notwithstanding Bullock's already lengthy imprisonment and rehabilitative efforts, the Court cannot help but conclude that he is a violent individual and that his continued incarceration is necessary to protect the public. Also, releasing Bullock on compassionate release would be inconsistent with deterring him from future acts of violence, with the objective of providing general deterrence to others who would act as he has acted while in the drug trade, and with the objective of protecting the community.

There is evidence that Bullock has engaged in significant rehabilitative efforts while in prison, and he is to be commended for putting that time to good use. However, the efforts shown on the record here are certainly not extraordinary as to support a sentence reduction and they certainly do not offset in any way Bullock's long history of violent behavior or the consequences of the offenses of conviction. Nor do those efforts support a finding that the imposed life sentence is not necessary to protect the public, to provide specific and general deterrence and to promote respect for the law. The life sentence was necessary to those ends when imposed and remains so today.

11

## CONCLUSION

For the reasons set forth above, the MOTION PURSUANT TO TITLE 18 U.S.C. SECTION 3582(c)(1)(A) FOR SENTENCE REDUCTION UNDER THE FIRST STEP ACT OF 2018 (ECF No. 341) (filed *pro se*) and the SUPPLEMENTAL MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) (ECF No. 362) (filed by counsel) will be denied.

It is so ORDERED.

_____ /s/ _____
Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: July _13_, 2023

12